UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO.  3:20-CV-00524-CHB-CHL

TRACIE L. GARDNER,                                                          Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY, [1]                          Defendant.

<u>REPORT AND RECOMMENDATION</u>

Before the Court is the Complaint (DN 1) of Plaintiff Tracie L. Gardner ("Gardner"),
seeking judicial review of the final decision of the Commissioner of Social Security (the
"Commissioner").  *See* 42 U.S.C. § 405(g).  On February 26, 2021, Gardner filed her fact and law
summary (DN 15), and in response, on May 28, 2021, the Commissioner filed her fact and law
summary (DN 21).  This case was referred to the undersigned Magistrate Judge to prepare a report
and recommendation.  (DN 14.)  Therefore, this matter is ripe for review.

I.      **FINDINGS OF FACT**

On June 24, 2014, Gardner applied for Disability Insurance Benefits ("DIB") and
Supplemental Security Income Benefits ("SSI"), alleging that she was disabled as of April 15,
2014.  (DN 13, at PageID # 139.)  After her applications were denied initially and again on
reconsideration, Administrative Law Judge ("ALJ") Steven Collins conducted a hearing on
Gardner's applications on January 27, 2015.  (*Id.*)  During the hearing, ALJ Collins heard
testimony from Gardner as well as vocational expert Robert G. Piper.  (*Id.*)  In a decision dated
April 27, 2017, ALJ Collins engaged in the five-step evaluation process promulgated by the

---

[1] As Kilolo Kijakazi is now the Acting Commissioner of Social Security in place of Andrew Saul, she is automatically
substituted as the Defendant in this matter pursuant to Fed. R. Civ. P. 25(d).  The undersigned will direct the Clerk to
change the case caption to reflect the substitution.

Commissioner to determine whether an individual is disabled, and in doing so, made the following

findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since April 15, 2014, the alleged onset date (20 CFR 404.1571 *et seq.*, at 416.971 *et seq.*).

3. The claimant has the following severe impairments: lumbar degenerative disc disease with radiculopathy, diabetes mellitus, osteopenia, right shoulder impingement syndrome, obesity, and COPD (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.926 and 416.926).

5. [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally stoop and crawl, frequently climb ramps and stairs, and never climb ladders, ropes, or scaffolds. She can occasionally reach overhead and push and pull with her right upper extremity. She should avoid concentrated exposure to pulmonary irritants including fumes, odors, dust, gas, and poor ventilation, as well as temperature extremes and humidity.

6. The claimant is capable of performing relevant past work as a [sic] auditor, claims adjuster, and claims supervisor. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined by the Social Security Act, from April 15, 2014, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(*Id.* at 141–48.)

Gardner requested review of ALJ Collins's decision, and her request was denied by the

Appeals Council on July 20, 2017.   (*Id.* at 72, 319.)  Plaintiff did not timely seek further appeal,

rendering ALJ Collins's decision final.  After this denial, on May 24, 2017 and September 21, 2017,[2] Gardner again protectively applied for DIB and SSI, respectively.  (DN 13, at PageID # 212–13, 300, 302.)  Gardner's applications were denied initially on January 24, 2018, and on April 2, 2018, they were denied on reconsideration.  (*Id.*, at PageID # 214, 218, 224, 231.)  ALJ William C. Zuber conducted a hearing on Gardner's applications on April 29, 2019.  (*Id.*, at PageID # 103– 35.)  During the hearing, ALJ Zuber heard testimony by Gardner who was assisted by counsel, as well as vocational expert Shannon Hollander.  (*Id.*)  In a decision dated August 14, 2019, ALJ Zuber engaged in the five-step evaluation process promulgated by the Commissioner to determine whether an individual is disabled, and in doing so, made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2018.

2. The claimant has not engaged in substantial gainful activity since May 3, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: Degenerative Changes of the Lumbar Spine; Diabetes Mellitus with Peripheral Neuropathy; Right Shoulder Impingement; Chronic Obstructive Pulmonary Disease; and Obesity (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), except: the claimant is able to use the dominant right upper extremity for

---

[2] While ALJ Zuber's decision determined these protective application dates, the record is inconsistent as to the date of her applications.  In her fact and law summary, Gardner claims that the date of both applications is September 21, 2017, citing to dates listed on the Disability Determination Explanation for the initial and reconsideration determinations.  The Commissioner claims that the date of the DIB application was September 22, 2017 and the date of the SSI application was October 13, 2017, citing to the DIB and SSI application summaries.  Neither the Gardner nor the Commissioner disputes ALJ Zuber's protective filings dates.  The undersigned finds that ALJ Zuber's protective filing dates are supported by the record and that the disputed actual application dates do not affect the undersigned analysis in this report and recommendation.

occasional reaching overhead, pushing and pulling; the claimant requires the use of a cane for ambulation; the claimant is able to perform occasional stooping, crouching, crawling, kneeling and climbing of ramps or stairs but no climbing of ladders, ropes or scaffolds; and the claimant is able to have no concentrated exposure to dust, fumes, gases, odors, poor ventilation or extremes of temperature extremes or humidity.

6. The claimant is capable of performing relevant past work as a Claims Examiner (Auditor and Adjuster) and as a Claims Supervisor. This type of work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined by the Social Security Act, from May 3, 2017, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(*Id.*, at PageID # 75–95.)

On September 17, 2019, Gardner filed a request for review, and on May 21, 2020, the Appeals Council _____ at which point, ALJ Zuber's decision became the final decision of the Commissioner. (*Id.*, at PageID # 58, 61, 297–99.) On July 24, 2020, Gardner timely filed this action. (DN 1.)

## II.    CONCLUSIONS OF LAW

### A. Standard of Review

The Court may review the final decision of the Commissioner, but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards. 42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir.

2013); *see Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding

that if the Court determines the ALJ's decision is supported by substantial evidence, the court

"may not even inquire whether the record could support a decision the other way").  However,

"failure to follow agency rules and regulations" constitutes lack of substantial evidence, even

where the Commissioner's findings can otherwise be justified by evidence in the record.  *Cole v.*

*Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

### B.  Five-Step Sequential Evaluation Process

The Commissioner has promulgated regulations that set forth a five-step sequential

evaluation process that an ALJ must follow in evaluating a disability claim. 20 C.F.R. § 404.1520

(2020). In summary, the evaluation process proceeds as follows:

1.  Is the claimant involved in substantial gainful activity? If the answer is "yes," the claimant is not disabled.  If the answer is "no," proceed to the next step.

2.  Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[3] and significantly limits his or her physical or mental ability to do basic work activities?  If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

3.  Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1?  If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

4.  Does the claimant have the residual functional capacity ("RFC") to return to his or her past relevant work?  If the answer is "yes," then the claimant is not disabled.  If the answer is "no," proceed to the next step.

---

[3] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve (12) months.  20 C.F.R. § 404.1509 (2020).

5. Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work?  If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

20 C.F.R. § 404.1520(a)(4).

The claimant bears the burden of proof with respect to steps one through four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing.  *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008).  The claimant always retains the burden of proving lack of RFC.  *Id.*; *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 392 (6th Cir. 1999).

### C.  Gardner's Contentions

Gardner contends that ALJ Zuber erred at Step 2 of the five-step sequential analysis in finding that her alleged impairments to her cervical spine and hands were not severe and at Step 5 in determining her RFC.  (DN 15, at PageID # 750.)  The undersigned addresses Gardner's arguments below.

#### 1.  Step 2 – Severe Impairments Determination

Gardner argues that ALJ Zuber erred in finding that her cervical spine impairment did not meet the durational requirements to be considered severe set forth in 20 C.F.R. §§ 404.1509, 416.909 and that he otherwise improperly weighed the medical evidence in determining that her cervical impairment not severe.  (DN 15-1, at PageID # 759–61.)  Gardner also argues that ALJ Zuber improperly weighed the medical evidence of her hand impairment and misstated the record concerning this impairment in determining that it was not severe.  (*Id.* at 761–62.)

The Sixth Circuit has repeatedly held that an ALJ's determination that some, but not all, alleged impairments are not severe is "legally irrelevant."  *Emard v. Comm'r of Soc. Sec.*, 953 F.3d

844, 852 (6th Cir. 2020) (citing *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008)).  *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987).  This is because if the ALJ finds at least one severe impairment, he or she "should consider both the severe and non-severe impairments in the remaining steps." *Norris v. Saul*, No. 1:19-CV-00133-HBB, 2020 WL 3041276, at *3 (W.D. Ky. June 5, 2020) (citations omitted).  *See, e.g.*, 20 C.F.R. §§ 404. 1545(a)(2), 416.945(a)(2) (2020) (in an RFC determination, the ALJ "will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe.")  "An erroneous finding of nonseverity at step two is therefore harmless where the ALJ properly considers nonsevere impairments at later steps." *Emard*, 953 F.3d at 852 (citing *Maziarz*, 837 F.2d at 244).  Here, at Step 2, ALJ Zuber found that Gardner had five "severe" impairments including degenerative changes of the lower spine and diabetes mellitus with peripheral neuropathy affecting her lower extremities.  (DN 13, at PageID # 75.)  He further found that Gardner's alleged impairment from degenerative changes in her cervical spine and impairment to her hands attributed to peripheral neuropathy and arthritis were not severe.  (*Id.* at 77–79.)  At Step 3, ALJ Zuber considered the medical evidence and concluded, in relevant part, that Gardner's combined impairments did not meet or medically equal Listing 1.04 Disorders of the Spine nor Listing 11.14 Peripheral Neuropathies.  (*Id.* at 83–84.)  At Step 4, ALJ Zuber considered the medical evidence in assessing Gardner's RFC.  (*Id.* at 84–95.)  He concluded that the record did not support a more restrictive RFC than ALJ Collins previously determined, except that worsening of her peripheral neuropathy in her feet required greater crouching, kneeling, and climbing limitations and the use of a cane for ambulation.  (*Id.* at 94–95.)  ALJ Zuber relied on his RFC determination in finding that Gardner could return to her past relevant work and was not disabled.  (*Id.* at 96.)  In sum, because ALJ Zuber found that other impairments

are severe, continued with the sequential evaluation process, and considered all of Gardner's impairments in the remaining steps, any purported error in his severity determination is harmless. *See Anthony*, 266 F. App'x at 457.

Gardner argues that the harmless error recognized by the Sixth Circuit in *Anthony* does not apply because "[t]he ALJ never discussed her cervical or hand condition again after step 2." (DN 15-1, at PageID # 762.) The Sixth Circuit recently addressed such an argument, noting that, "[a]lthough the ALJ did not specifically discuss the combined effect of [the plaintiff]'s impairments or mention [his] nonsevere impairments in assessing his residual functional capacity, she stated that she had carefully considered the entire record and 'all symptoms' at this step in the process." *Emard*, 953 F.3d at 851 (6th Cir. 2020). The court found that the ALJ had sufficiently considered the plaintiff's combination of impairments as required by 20 C.F.R. § 416.945(e) and SSR 96-8p, and subsequently rejected the plaintiff's argument that the ALJ erred in assessing the severity of certain impairments "because [it] ha[d] determined that the ALJ properly considered [the plaintiff]'s nonsevere impairments at later steps." *Id.* at 852. Specifically, the court found that the ALJ's "express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by [the plaintiff]'s nonsevere impairments at step two of her analysis," plus her subsequent assurance that she had "considered the entire record and 'all symptoms,' " provided a sufficient basis to conclude that the ALJ properly considered all of the plaintiff's impairments when crafting the RFC. *Id.* at 851–52. Here, ALJ Zuber recognized that he "must consider all of the claimant's impairments, including impairments that are not severe," and cited to SSR 96-8p. (DN 13, at PageID # 74.) At Step 4, ALJ Zuber stated that he "considered all symptoms" and relied on "the total medical and other evidence." (*Id.* at 84, 93.) Finally, his analysis at Step 2 included a thorough discussion of Gardner's alleged cervical and hand impairments and made

8

express findings as to their limiting effects. (*Id.* at 77–79.) Under the standard applied in *Emard*, these facts are sufficient to render ALJ Zuber's severity determinations legally irrelevant. As will be discussed more fully below, ALJ Zuber sufficiently considered Gardner's medically determinable impairments in assessing Gardner's RFC, and therefore, his determination of the severity of those impairments is not grounds for reversal.

## 2. Step 4 – RFC Determination

A claimant's RFC is "the most [a claimant] can still do despite [the claimant's] limitations . . . based on all relevant evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC finding is based on a consideration of medical source statements and all other evidence, medical and non-medical, in the record. *Id.* Thus, in making the RFC finding, the ALJ must assign weight to the medical source statements in the record and consider the descriptions and observations of the claimant's limitations as a result of any impairments from the claimant and the claimant's family and friends. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). Here, Gardner claims that ALJ Zuber incorrectly found himself to be bound by the prior decision of ALJ Collins. (DN 15-1, at PageID # 763.) Gardner also argues that ALJ Zuber's RFC determination is not supported by substantial evidence because "he failed to consider [Gardner]'s worsening degenerative disease and peripheral neuropathy." (*Id.* at 762–63.) Additionally, as was discussed in Part III.C.1. above, Gardner argues that ALJ Zuber failed to consider new evidence related to her alleged cervical and hand impairments. (*Id.* at 659–62.) The undersigned addresses each of Gardner's arguments below.

### 1. *Drummond/Earley*

Because Gardner has previously applied for DIB and SSI and ALJ Collins issued a written decision, ALJ Zuber considered ALJ Collins's prior findings according to the standards set by the

Sixth Circuit in *Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 837 (6th Cir. 1997). *Drummond* stands for the proposition that principles of *res judicata* are binding on both claimants and the Commissioner and that where "the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842. In recognition of this ruling, the SSA issued AR 98-4(6) directing those within the Sixth Circuit to follow that holding. SSAR 98-4(6), 63 Fed. Reg. 29,771 (June 1, 1998). AR 98-4(6) explains:

> When adjudicating a subsequent disability claim with an unadjudicated period arising under the same title of the [Social Security] Act as the prior claim, adjudicators must adopt such a finding from the final decision by an ALJ or the Appeals Council on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding . . . .

*Id.* at 29,773. The Sixth Circuit recently clarified that when considering a subsequent disability claim for a new period of disability, an ALJ is permitted to review prior ALJ findings but is not bound by them. *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 933-34 (6th Cir. 2018). In considering a successive application that covers a new period of disability, a subsequent ALJ should take a "fresh look" at the new record to determine if a claimant's condition has worsened or new evidence changes previous analysis. *Id.* at 931. However, the Sixth Circuit cautioned that a successive applicant who offers "no new evidence after a failed application . . . should not have high expectations about success." *Id.* at 933. It noted, "What's past likely will be precedent in that setting—as indeed it should be in a system designed to apply the law consistently to similarly situated individuals." *Id.* at 933-34.

Here, ALJ Zuber correctly identified the barrier Gardner had to overcome in order for a new determination to be made in her second application, stating that he "may not make different

findings in adjudicating this claim for a subsequent claimed period of disability unless new and additional evidence or changed circumstances after the date of the prior decision provide a basis for re-examining issues that were previously determined."  (DN 13, at PageID # 74.)  Gardner asserts that this statement of law was ALJ Zuber's "first error" because "the ALJ is not bound by the findings in the prior decision and can take a fresh look at the evidence."  (DN 15-1, at PageID # 763.)  However, Plaintiff fails to explain how ALJ Zuber's analysis is inconsistent with the directive from *Earley* that ALJs take a fresh look at a claimant's application.  To the contrary, ALJ Zuber discussed the earlier record and ALJ Collin's decision, considered them in light of the current record, and explained why he agreed or disagreed with specific findings.  (DN 13, at PageID # 75–83, 86–95.)  He departed from ALJ Collins's findings in ways that disfavored Gardner's allegations, such as his finding that her osteopenia was no longer severe, and in ways that bolstered her allegations, such as his more restrictive RFC determination.  (*Id.*)  In imposing additional restrictions to Gardner's RFC, ALJ Zuber noted that "the findings in this decision differing from the prior decision are not barred based on new evidence in the current record."  (*Id.* at 95.)  Thus, although ALJ Zuber issued his decision prior to the Sixth Circuit's clarification of *Drummond* in *Earley*, the decision follows the same framework set forth in *Earley* in treating ALJ Collins's findings as "legitimate, albeit not binding."  *Earley*, 893 F.3d at 933.  *See Goins v. Saul*, No. CV 19-117-DLB, 2020 WL 1290784, at *5 (E.D. Ky. Mar. 18, 2020) (collecting cases confirming that "even when an ALJ uses language 'suggesting that he was required to adopt the prior RFC,' an ALJ may be found to have given the evidence a fresh look, as required under *Earley*").  The undersigned therefore finds that ALJ Zuber's articulation of the *Drummond* standard is not grounds for reversal.

### 2.  Lumbar Impairment

Gardner argues that ALJ Zuber erred in determining that her lumbar spine impairment had persisted but did not deteriorate to a degree to require a more restrictive RFC than was found by ALJ Collins.  (DN 15-1, at PageID # 763–64.)  Gardner notes that ALJ Collins's finding relied on the fact that at the time, Gardner only sought conservative treatment and had reported improvement to her back pain and points to evidence in the current record to show that Gardner's present condition is "completely different."  (*Id.* at 764.)  Specifically, Gardner notes that in the current record, there is evidence that she sought additionally treatment, "[s]he tried physical therapy and was willing to try injections."  (*Id.*)  Gardner asserts that "it is not clear why the ALJ believed [Gardner]'s condition did not change and the finding of light work was still appropriate."  (*Id.*)  Gardner does not explain nor cite to any authority providing that recommended physical therapy and nerve branch block injections are indicative of "substantial deterioration" of her lumbar impairment.  Additionally, she does not explain why her purported deterioration precludes light work or is otherwise inconsistent with ALJ Zuber's RFC.

In his RFC determination, ALJ Zuber cited to Gardner's own reports and testimony regarding the limiting effects of her back pain on her activities of daily life, including that she sometimes needs assistance with personal care "when her back is spasming," cannot perform household chores requiring stooping or bending, lies down for an hour to rest her back, and seldom leaves the house to socialize due in part to back pain.  (DN 13, at PageID # 85–86.)  On the other hand, ALJ Zuber noted that Gardner also reported that she independently performs grooming and personal care, prepares food for herself and helps with preparing meals about sixty-percent of the time, exercises for 30-45 minutes daily, regularly helps with household chores, visits with friends and family, and drives herself places.  (*Id.*)  ALJ Zuber also thoroughly discussed the medical evidence related to Gardner's lumbar impairment, including expressly noting each piece of new

12

evidence that Gardner cites as supporting deterioration of the impairment.  (*Compare* DN 13, at PageID # 86–90, *with* DN 15-1, at PageID # 764.)  Specific to the time period at issue, ALJ Zuber noted that Gardner treated for back pain in February 2018 following a fall down stairs, but presented "overall normal objective findings" in a March 2018 examination and did not seek further treatment for her lumbar impairments until September 2018, "suggest[ing] the acute symptoms from the February 2018 fall had resolved and the claimant had returned to her previous baseline level of function within 1-2 months."  (DN 13, at PageID # 87.)  ALJ Zuber noted that in September 2018, Gardner reported moderate lower back pain, that physical therapy had failed, and presented tenderness in her lumbar region and a reduced lower extremity reflex response, but also presented overall normal objective findings including normal motor function, strength, sensation, and gait.  (*Id.* at 87–88.)  ALJ Zuber noted that in January 2019, Gardner reported increased pain and presented greater lumbar/lumbosacral spine and paraspinal muscle tenderness and spasms and reduced range of motion, but also showed no acute distress, normal muscle tone, strength, and sensation.  (*Id.* at 88.)  ALJ Zuber noted that lumbar nerve branch block injections were recommended with a plan to proceed to future radiofrequency nerve ablations.  (*Id.*)  As of the time of the hearing, Gardner had not yet received the injections.  (*Id.*)  Based on the foregoing, it is clear that ALJ Zuber gave the record a fresh look and considered new material evidence of the limiting effects of her lumbar impairment as required by *Earley*.  After doing so, he reasonably concluded that the evidence in the current record did not demonstrate that further limitations were necessary.  Therefore, the undersigned finds that ALJ Zuber's assessment of Gardner's lumbar impairment in his RFC analysis is supported by substantial evidence.

### 3.  Peripheral Neuropathy

Next, Gardner argues that ALJ Zuber erred in relying on ALJ Collins's RFC because the current record includes evidence of deteriorating peripheral neuropathy since ALJ Collins's decision. (DN 15-1, at PageID # 764–65.) Specifically, Gardner asserts that despite ALJ Zuber's references to findings of grossly intact lower extremity sensation, "every treatment note from [Gardner's podiatrist], and some notes from other providers, state the exact opposite." (*Id.* at 764.) Gardner notes that her podiatry treatment records from July 2017 to December 2019 show "Sensation absent at level of digits with SWMF 5.07g; Proprioception and Vibration with 126 HZ tuning fork are absent bilateral." (*Id.* at 765.) Gardner suggests that LAJ Zuber may have believed "absent" meant "normal" and asserts that "[a]bsent sensation is the exact opposite of grossly normal, as it means she has no sensation at all in her feet; she cannot feel anything." (*Id.*)

As an initial matter, it appears that it is Gardner who misunderstands the medical terminology. Semmes-Weinstein monofilament, or SWMF, is a tool used to evaluate sensation levels by applying a microfilament to a test site. (DN 13, at PageID # 89, 635.) Thus, her podiatrist's notes do not indicate a finding that that Gardner "has no sensation at all in her feet," but rather a finding that she had a loss of sensation at specific points on her toes. Contrary to Gardner's assertion that he "failed to acknowledge these findings," (DN 15-1, at PageID # 765), ALJ Zuber addressed Gardner's SWMF test results, noting for example her podiatrist's "consistent repeated findings of absent 'digit sensation' to touch" and another podiatrist's July 2018 finding of diminished sensation at five locations bilaterally. (DN 13, at PageID # 89.) ALJ Zuber contextualized these findings noting that at the time Gardner showed "*otherwise* grossly intact sensation" and "*otherwise* overall intact sensation," respectively. (*Id.*) Indeed, consistent with ALJ Zuber's findings, each of her podiatrist's treatment notes that Gardner cites precedes the SWMF finding with a finding that "Sensation is grossly intact bilateral." (*See, e.g.*, *id* at 415.)

Second, ALJ Zuber *departed* from ALJ Collins's RFC determination with respect to Gardner's peripheral neuropathy impairment in part *because of the evidence of deterioration* since the prior decision. As Gardner concedes, "ALJ [Zuber] spent two pages of his decision discussing [Gardner]'s diabetes and neuropathy." (DN 15-1, at PageID # 764.) (*See* DN 13, at PageID 89–90.) This discussion shows that ALJ Zuber gave the record a fresh look and considered new material evidence of the limiting effects of her peripheral neuropathy impairment as required by *Earley*. Based on that discussion, ALJ Zuber found that "[t]he medical evidence in the current record supports persistent diabetes and diabetic neuropathy with little change in regard to management of the claimant's diabetes but progression and worsening of diabetic peripheral neuropathy and other problems in her feet." (DN 13, at PageID # 88.) He therefore determined that additional limitations were necessary, including reducing her climbing of ramps and stairs from frequently to occasionally, adding crouch and kneel limitations to be performed occasionally, and adding a walking limitation to require the use of a cane. (*Id.* at 92.) Gardner has not provided any reason why reduced sensation to her feet, or any other evidence of deterioration, made further restrictions necessary. Upon review of the record, the undersigned finds that the ALJ Zuber's assessment of Gardner's peripheral neuropathy impairment in his RFC analysis is supported by substantial evidence.

### 4. Cervical Impairment

As was discussed in Part III.C.1. above, Gardner argues that ALJ Zuber erred at Step 2 in determining that her cervical impairment was not severe and that this finding caused errors in ALJ Zuber's RFC analysis at step 4 because he only "considered each specific impairment he found severe . . . [and] never discussed her cervical [] condition again after step 2." (DN 15-1, at PageID

# 762.)  To the extent that Gardner argues that the level of impairment from her cervical condition required a more restrictive RFC determination, the undersigned will briefly address the issue.

Gardner objects to the ALJ's reliance on the lack of medically imposed limitations in assessing the severity of Gardner's cervical impairment.  (*Id.* at 761.)  Gardner asserts that at the time of the hearing, her "cervical condition was still being evaluated and there are no further treatment records . . . to determine whether medical restrictions would be imposed." (*Id.*)  Gardner also notes that the only medical opinions in the record are of two state agency reviewing consultants dated April 2018, before Gardner's renewed complaints of neck pain beginning in January 2019.  (*Id.*)  Gardner argues that ALJ Zuber erred because he "simply pointed out a deficiency in the record, and then relied on that deficiency to find the impairment not severe." (*Id.*)  Gardner's argument is unpersuasive for several reasons.

First, there is no basis for Gardner's claim that her cervical condition was still being evaluated.[4]  As ALJ Zuber noted, Gardner alleged neck pain in her 2014 SSI and DIB applications, which was discussed in ALJ Collins's decision.  (DN 13, at PageID # 146.)  After reporting recurring neck pain to her pain management specialist in January 2019, Gardner was referred for an x-ray which occurred February 6, 2019.  (DN 13, at PageID # 647.)  The x-ray showed normal alignment of the cervical vertebrae, no acute fracture or subluxation, no significant focal osseus abnormalities, moderate multilevel cervical spondylosis, and moderate degenerative joint changes. (*Id.*)  She was referred to pain management.  (*Id.*)  In a visit on April 3, 2019, Gardner's primary care professional explained the results of the x-ray scan.  (*Id.* at 743.)  It was noted that Gardner

---

[4] Under the regulations, it was Gardner's duty to submit all evidence of her disability. 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1).  Any argument that the ALJ failed to adequately develop the record is waived.  *See United States v. Layne*, 192 F.3d 556, 566 (6th Cir.1999) (quoting *McPherson v. Kelsey*, 125 F.3d 989, 995 96 (6th Cir.1997)); *see also Brindley v. McCullen*, 61 F.3d 507, 509 (6th Cir.1995) (observing that "[w]e consider issues not fully developed and argued to be waived.")

was applying for disability and "brought in a paper to be filled out regarding her [degenerative disc disease] of the Lspine . . . diabetic neuropathy and the COPD." (*Id.* at 739.) Apparently, Gardner did not request an assessment of her the degenerative changes to her cervical spine at that time. During the examination, no reports of continuing cervical pain or symptoms were noted, and her neck was noted as supple under palpation. (*Id.* at 742.) During the hearing, when asked about her treatment for her cervical spine, Gardner did not report seeking any further evaluation since the x-ray six months before. (*See id.* at 109–13.) The forgoing is inconsistent with Gardner's claim that she was still being evaluated and her suggestion that functional limitations were to be determined.

Additionally, as the Commissioner notes, ALJ Zuber did not rely *solely* on the lack of medically imposed functional limitations in assessing the severity of her cervical impairment. He discussed ALJ Collins's findings that there was no medically determined etiology for her alleged neck pain and that she showed normal range of motion in her neck. (*Id.* at 78.) He discussed the medical evidence of deterioration since ALJ Collins's decision, including the February 2019 x-ray and a January 2019 evaluation by Gardner's pain management specialist, who noted significant paraspinal neck tenderness with otherwise normal cervical spine findings, diagnosed her with cervicalgia, and ordered the x-ray of the cervical spine. (*Id.* at 77–78.) He also noted records showing findings of no acute distress, normal muscle tone and strength, no joint swelling, and no abnormalities of the neck or cervical spine. (*Id.* at 78.) ALJ Zuber relied on this evidence as well as the lack of medically imposed restrictions and reasonably concluded that he had not found that Gardner's "cervical spine impairment has caused any more than a minimal limitation of her ability to perform basic work activities . . . ." (*Id.*) Gardner has not cited any evidence that her cervical impairment caused functional limitations that made further RFC restrictions necessary. Upon

review of the record, the undersigned finds that the ALJ Zuber's assessment of Gardner's cervical impairment is supported by substantial evidence.

### 5. Hand Impairment

As was discussed in Part III.C.1. above, Gardner argues that ALJ Zuber erred at Step 2 in determining that her hand impairment was not severe and that this finding caused errors in ALJ Zuber's RFC analysis at step 4 because he only "considered each specific impairment he found severe . . . [and] never discussed her [] hand condition again after step 2." To the extent that Gardner argues that the level of impairment from her hand condition required a more restrictive RFC determination, the undersigned will briefly address the issue.

Gardner objects to ALJ Zuber's reliance on the lack of supporting objective findings in assessing the severity of her hand impairment. (*Id.* at 761–62.) For example, Gardner asserts that he "relied on normal range of motion and muscle strength" despite there being "no law or regulation stating that a person must show reduced strength or range of motion to establish an impairment is severe." (*Id.* at 761.) Gardner also notes among the objective findings in the record the red nodules to the hands on September 13, 2018 and a note that she had chronic pain and swelling on April 3, 2019. (*Id.* at 761–62.) Gardner asserts that "ALJ [Zuber] does not cite any authority for his proposition that the objective findings in the record are insufficient to show Plaintiff has limitations." (*Id.* at 761.) Gardner has not provided any reason why the red nodules and swelling made further restrictions necessary. However, she does assert that "her pain symptoms alone could be sufficient to justify some limitation in the RFC." (*Id.* at 762.)

In determining whether a claimant suffers from debilitating pain and/or other symptoms, the two-part test set forth in *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986), applies. First, the ALJ must examine whether there is objective medical evidence of

an underlying medical condition.  If there is, then the ALJ must determine: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged disabling pain." *Id.*  When, as in this case, the reported pain and/or other symptoms suggest an impairment of greater severity than can be shown by objective medical evidence, the ALJ will consider other information and factors which may be relevant to the degree of pain alleged.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

A claimant's level of daily activity is a factor which the ALJ may consider in determining the extent to which pain is of disabling severity.  20 C.F.R. §§ 404.1529(c)(3)(i), 416.929(c)(3)(i); *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993); *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) (As a matter of law, the ALJ may consider household and social activities in evaluating complaints of disabling pain.).  Also considered in assessing their complaints is the frequency that a claimant has sought treatment for their impairments.  20 C.F.R. §§ 404.1529(c)(3)(v), 416.929(c)(3)(v).  Additionally, another factor that may be considered is whether there are "any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence . . . ." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  Finally, the medication used to alleviate the alleged pain or other symptoms may be considered.   20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3)(iv).   Mild medication and infrequency of dosages taken by the claimant do not bear out claims of debilitating pain. *See Maher v. Sec'y of Health & Human Servs.*, 898 F.2d 1106, 1109 (6th Cir. 1989).

Here, ALJ Zuber found that Gardner's symptoms had not "caused any more than minimal limitation of her ability to use her hands/fingers to perform basic work activities . . . ." (*Id.* at 79.) In doing so, he relied on treatment records, including a 2017 note that Gardner reported that her

hand pain was "tolerable" with the assistance of pain and other medication and a January 2019 primary care note that her osteoarthritis was "stable." (*Id.* at 78–79.) He also relied on consistent objective findings of normal muscle tone, strength and range of motion.  (*Id.* at 78–79.)  Contrary to Gardner's suggestion, these factors are relevant to assessing the limiting effects of symptoms, including pain.  *See, e.g.*, 20 C.F.R. § 404.1569a.  ("Your impairment(s) and related symptoms, such as pain, may cause limitations of function or restrictions which limit your ability to meet certain demands of jobs . . . Limitations are classified as exertional *if they affect your ability to meet the strength demands of jobs*.") (emphasis added).   In his RFC analysis, ALJ Zuber considered Gardner's own reports and testimony regarding the limiting effects of her pain on her activities of daily life, including activities requiring the use of her hands such as independently managing personal care and hygiene except needing assistance when her back is spasming, preparing food for herself and helping prepare meals "about 60% of the time such as by making salads, peeling potatoes, and cutting/chopping vegetables that she can do while seated," helping with household chores, using a computer "for an hour to a couple of hours daily," driving, and shopping.  (DN 13, at PageID # 93–94.)  ALJ Zuber reasonably concluded that the foregoing was inconsistent with disabling limitations.  Upon review of the record, the undersigned finds that ALJ Zuber's assessment of Gardner's hand impairment is supported by substantial evidence.

### III.    RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED** and that judgment be **GRANTED** in favor of the Commissioner.

Pursuant to Fed. R. Civ. P. 25(d), Kilolo Kijakazi, Acting Commissioner of Social Security, is substituted as the Defendant in place of Andrew Saul, and the Clerk of Court is directed to change the case caption to reflect the substitution.

Colin H Lindsay, Magistrate Judge
United States District Court

January 3, 2022

cc:  Counsel of record

### Notice

Pursuant to 28 U.S.C. § 636(b)(1)(B)-(C), the undersigned Magistrate Judge hereby files with the Court the instant findings and recommendations.  A copy shall forthwith be electronically transmitted or mailed to all parties.  28 U.S.C. § 636(b)(1)(C).  Within fourteen (14) days after being served, a party may serve and file specific written objections to these findings and recommendations. Fed. R. Civ. P. 72(b)(2).  Failure to file and serve objections to these findings and recommendations constitutes a waiver of a party's right to appeal.  *Id.; United States v. Walters,* 638 F.2d 947, 949-50 (6th Cir. 1981); *see also Thomas v. Arn,* 474 U.S. 140 (1985).